# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND BOLAN, | ) | CASE NO. 1:13CV857 |
| | ) | |
| Petitioner, | ) | JUDGE LESLEY BROOKS WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CHRISTOPHER LaROSE, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Raymond Bolan ("Bolan"), challenges the constitutionality of his conviction in

the case of *State v. Bolan*, Cuyahoga County Court of Common Pleas Case No. CR-09-531193.

Bolan, represented by counsel, filed his Petition for a Writ of Habeas Corpus (Doc. No. 1)

pursuant to 28 U.S.C. § 2254 on April 17, 2013.  On July 1, 2013, Warden Christopher LaRose

("Respondent") filed his Return of Writ.  (Doc. No. 8.)  Bolan filed a Traverse on October 4,

2013.  (Doc. No. 13.)  For reasons set forth in detail below, it is recommended that Bolan's

Petition be DENIED.

### I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. §

2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v.*

*Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts

underlying Bolan's conviction as follows:

{¶ 2} In November 2009, Bolan was charged in a five-count indictment. Count 1 charged him with aggravated murder and carried a mass murder specification and one- and three-year firearm specifications.  FN1  Count 2 charged him with murder and carried a one- and three-year firearm specification.  Count 3 charged him with felonious assault and carried a one- and three-year firearm specification. Count 4 charged him with attempted murder and carried a one- and three-year firearm specification.  Count 5 charged him with felonious assault and carried a one- and three-year firearm specification.  Counts 1–3 identify Jerome Fears (Fears) as the victim and Counts 4–5 identify Basheer Wheeler (Wheeler) as the victim.  The matter proceeded to a jury trial, at which the following evidence was adduced.

FN1. The State dismissed the mass murder specification prior to trial.

{¶ 3} On November 4, 2008, Fears and Wheeler were walking on Central Avenue in Cleveland, Ohio.  They were in the CMHA housing projects on their way to Wheeler's brother's house, when they encountered a group of males gathered on the sidewalk.  Bolan, who was one of the males in the group, told Fears to "take off his hoodie.  Nobody can be walking with hoodies around here."  Fears took his hoodie off and continued walking with Wheeler. Bolan then asked the group of males, "who got a hammer?"  One of the males gave Bolan a gun.  Wheeler looked back twice and observed Bolan pointing the gun at him and Fears, while they continued walking.  Bolan then fired the gun at them six times.  Wheeler ran to his brother's house and did not see what happened to Fears, who was shot in the back and died on the scene.  Wheeler testified that he has seen Bolan many times before, but did not know his name.  He testified that he described the shooter to Fears's girlfriend, who told him "that's Ray Ray."

{¶ 4} Shortly thereafter, Cleveland and CMHA police officers arrived on the scene.  Detective William Higginbottham (Higginbottham) of the CMHA Police Department testified that he responded to a call of shots fired in the 2700 block area of Central Avenue.  A female on the scene advised Higginbottham that Wheeler was with Fears when the shooting occurred.  She then took Higginbottham to see Wheeler.  Higginbottham spoke with Wheeler and relayed this information to Detective Joselito Sandoval (Sandoval) of the Cleveland Police Department.

{¶ 5} Sandoval testified that he initially interviewed Wheeler in a marked zone car on the night of the incident and took Wheeler's formal statement at the police station in December 2008.  On the night of the incident, Wheeler told Sandoval that he did not know the names of any of the males in the group.  He described the shooter as a black male in his mid to upper 20's, approximately 5'9", "thin build

-2-

but cocky," wearing a white hoodie, blue jeans, and prescription glasses.  At the station, he described the shooter as "a black male about 21 years old.  He is about 5 foot 9 inches tall, and has a muscular build.  He has a low haircut, and his face is clean shaven.  I think he has tattoos on his arms, and wears prescription glasses every time I've seen him.  He was wearing blue jeans, a pullover type white hoodie, with gold lettering on the front, and I think boots."  Sandoval testified that Wheeler identified "Ray Ray" (Bolan) as the shooter from the photo array given to him.

{¶ 6} Helen Ogletree (Ogletree), who testified outside the presence of the public, stated that on the night of November 4, 2008, she heard gunshots, so she looked out her window and noticed someone laying on the ground.  She then went outside and observed Fears's body on the ground and Bolan standing near him, with a gun in his hand.  She also observed another unknown male standing with Bolan, but she did not know who he was.  Ogletree further testified that she told Fears's girlfriend that Bolan killed Fears.  Ogletree did not speak with the police on the night of the incident.  During his investigation, Sandoval obtained Ogletree's name and contacted her.  Ogletree gave her statement to the police in July 2009. She described Bolan as "a black male, * * * in his 20s * * * big and husky and musclebound, like he just got out of the joint.  He wears dark framed glasses and has brush waves in his short hair.  He has a lot of tattoos on his arms and chest."  Sandoval testified that Ogletree identified "Ray Ray" as the shooter from the photo array given to her.

{¶ 7} DNA testing on six shell casings found at the scene revealed a mixture of DNA, which meant that more than one person's DNA was on the casings.  The DNA expert testified that "Bolan cannot be excluded as a possible contributor to the partial mixture profile obtained from [the shell casings.]"

{¶ 8} At the conclusion of trial, the jury found Bolan guilty of all charges and specifications.  The court merged Counts 1, 2, and 3 for purposes of sentencing and sentenced Bolan to 30 years to life on Count 1.  The court also merged the one- and three-year firearm specifications in Counts 1–5 and sentenced him to three years on the firearm specification to run consecutive and prior to Count 1.  The trial court sentenced him to three years on each of Counts 4 and 5 and three years on each gun specification, to be served concurrent to each other and consecutive to Count 1 for an aggregate of 36 years to life in prison.

*State v. Bolan*, 2011 WL 3925584 at * 1-2 (Ohio App. 8th Dist. Sept. 8, 2011).

## II.  Procedural History

**A.    Conviction**

On November 25, 2009, a Cuyahoga County Grand Jury charged Bolan with one count of Aggravated Murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01(A) together with a mass murder specification; one count of Murder in violation of O.R.C. §2903.02(B); one count of Felonious Assault in violation of O.R.C. § 2903.11(A)(1); one count of Attempted Murder in violation of O.R.C. § 2923.02/2903.02(A); and, one count of Felonious Assault in violation of O.R.C. § 2903.11(A)(2).[1]  (Doc. No. 8-1, Exh. 1.)  All five counts contained one and three-year firearm specifications.  *Id*.   Bolan pled not guilty to all charges.  *See* Docket for *State v. Bolan*, Cuyahoga County Court of Common Pleas Case No. CR-09-531193 at www.http.//cpdocket.cp.cuyahogacounty.us. (hereinafter "Docket.")

On March 31, 2010, the mass murder specification was dismissed upon motion of the State.  (Doc. No. 8-1, Exh. 2.)  The matter proceeded to a jury trial on August 23, 2010.  *See* Docket.  On August 27, 2010, a jury found Bolan guilty as charged.  *Id*.  On September 9, 2010, Bolan filed a Motion for New Trial based on the following six grounds: "(1) there were irregularities in the proceedings, or in any ruling of the court, or abuse of discretion by the court, because of which the Defendant was prevented a fair trial; (2) misconduct of the prosecuting attorney(s) or witnesses for the State; (3) accident or surprise which ordinary prudence could not have guarded against; (4) that the verdict is not sustained by sufficient evidence or is contrary to law; (5) error of law occurring at the trial; and, (6) there is new evidence material to the defense

---

[1]  Counts One through Three concerned Jerome Fears, who was shot in the back and died.  Counts Four and Five involved Basheer Wheeler.  (Doc. No. 8-1, Exh. 1.)

that was discovered which the Defendant could not with reasonable diligence have discovered and produced at trial."  (Doc. No. 8-1, Exh. 3.)  Bolan requested the trial court conduct a hearing. *Id*.  On September 14, 2010, the trial court issued a one-line Journal Entry denying Bolan's motion.  (Doc. No. 8-1, Exh. 4.)

On September 30, 2010, the trial court sentenced Bolan to an aggregate term of 36 years to life incarceration.[2]  (Doc. No. 8-1, Exh. 5.)

**B.    Direct Appeal**

On October 4, 2010, Bolan, through counsel, filed a timely Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court").  (Doc. No. 8-1, Exh. 6.)  Bolan raised the following assignments of error:

> I.    APPELLANT WAS DENIED HIS RIGHT TO DUE PROCESS OF LAW WHEN THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUPPORT HIS CONVICTIONS FOR AGGRAVATED MURDER (Fears) AND ATTEMPTED MURDER (Wheeler).
>
> II.   APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> III.  THE TRIAL COURT ERRED IN FAILING TO MERGE APPELLANT'S CONVICTIONS FOR ATTEMPTED MURDER AND FELONIOUS ASSAULT TOWARD A SINGLE VICTIM.
>
> IV.   IN REFUSING TO EITHER SECURE THE ATTENDANCE OF AN ESSENTIAL DEFENSE WITNESS OR GRANT A REASONABLE

---

[2]  Specifically, Bolan was sentenced as follows: "Counts 1, 2, and 3 merge for purposes of sentencing.  The gun specifications in Counts 1, 2, 3, 4, and 5 merge for purposes of sentencing.  In Count 1, the Defendant is sentenced to 3 years on the firearm specification to run consecutive to and prior to 30 years to life on the underlying offense. In Counts 4 and 5, the Defendant is sentenced to 3 years on each gun specification and 3 years on the underlying offenses; concurrent to each other and consecutive to the sentence in Count 1 for an aggregate sentence of 36 years to life."  (Doc. No. 8-1, Exh. 5.)

> CONTINUANCE FOR THIS PURPOSE, THE TRIAL COURT DENIED
> APPELLANT'S RIGHT TO A MEANINGFUL OPPORTUNITY TO
> PRESENT A COMPLETE DEFENSE, IN VIOLATION OF HIS RIGHTS
> TO COMPULSORY PROCESS, CONFRONTATION, DUE PROCESS,
> AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND
> FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND
> ARTICLE I OF THE OHIO CONSTITUTION.

> V.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED
>       TO GRANT APPELLANT'S MOTION FOR NEW TRIAL AND
>       FAILED TO HOLD A REQUESTED HEARING CONCERNING
>       NEWLY DISCOVERED EXCULPATORY EVIDENCE AND FAILED
>       TO CONSIDER HOW THE NEWLY DISCOVERED EVIDENCE
>       UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL.

> VI.   THE TRIAL COURT DENIED APPELLANT'S RIGHTS TO DUE
>       PROCESS AND CONFRONTATION WHEN IT EXCLUDED THE
>       PUBLIC DURING TESTIMONY OF KEY WITNESSES.

(Doc. No. 8-1, Exh. 7.)

On September 8, 2011, the state appellate court affirmed Bolan's convictions but

remanded for further proceedings on merger of allied offenses and resentencing with regard to

Counts Four and Five. *State v. Bolan*, 2011 WL 3925584 (Ohio App. 8th Dist. Sept. 8, 2011).

On October 19, 2011, Bolan, through counsel, filed a timely Notice of Appeal with the

Supreme Court of Ohio. (Doc. No. 8-1, Exh. 13.) Bolan raised the following Propositions of

Law:

> I.    A WAIVER OF THE RIGHT TO A PUBLIC TRIAL IS NOT
>       ADEQUATE UNLESS THE TRIAL COURT SATISFIES THE FOUR-
>       PRONG TEST OF WALLER V. GEORGIA (1984), 467 U.S. 39, 104
>       S.CT. 2210, 81 L.Ed.2d. 31. SIXTH AND FOURTEENTH
>       AMENDMENTS, UNITED STATES CONSTITUTION; SECTION 10,
>       ARTICLE I, OHIO CONSTITUTION.

> II.   THE PLAIN LANGUAGE OF CRIM. R. 33(A)(6), AND FEDERAL
>       AND STATE DUE PROCESS, REQUIRE A TRIAL COURT TO HOLD
>       A HEARING WHEN THE DEFENDANT'S MOTION FOR A NEW
>       TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE

DEMONSTRATES THE EXCULPATORY EVIDENCE WAS TURNED OVER TO THE DEFENDANT BY THE PROSECUTION AFTER THE JURY VERDICT OF GUILTY BUT BEFORE SENTENCING. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; SECTION 16, ARTICLE I, OHIO CONSTITUTION.

(Doc. No. 8-1, Exh. 14.)

On January 18, 2012, the appeal was dismissed as not involving any substantial constitutional question. (Doc. No. 8-1, Exh. 16.)

**C.    Application to Reopen Appeal**

On December 7, 2011, Bolan, through counsel, filed an Application for Reopening of Appeal pursuant to App. R. 26(B). (Doc. No. 8-1, Exh. 17.) Therein, Bolan argued his appellate counsel was ineffective because he failed to assert on appeal that trial counsel was ineffective when he (1) failed to object and/or acquiesced in the closure of the courtroom and restriction on Bolan's ability to confront witnesses; and, (2) failed to secure the attendance of defense witness, Carlyeliea Benson. *Id.*

On May 29, 2012, the state appellate court denied Bolan's Application to Reopen on the merits. (Doc. No. 8-1, Exh. 19.) On June 21, 2012, errors in the appellate court's decision were corrected *nunc pro tunc*. (Doc. No. 8-1, Exh. 20.) *See State v. Bolan*, 2012 WL 1951868 (Ohio App. 8th Dist. June 21, 2012). Bolan did not pursue an appeal to the Supreme Court of Ohio.

**D.    Resentencing**

On October 10, 2012, following remand, the trial court conducted a re-sentencing hearing. *See* Docket. In an Entry dated November 8, 2012, Bolan was again sentenced to an aggregate term of 36 years to life, as follows: "Counts 1, 2, and 3 merge for purposes of sentencing. The gun specifications in Counts 1, 2, 3, 4, and 5 merge for purposes of sentencing.

In Count 1, the defendant is sentenced to 3 years on the firearm specification to run consecutive

to and prior to 30 years to life on the underlying offense.  Counts 4 and 5 merge.  The State elects

to proceed to sentencing on Count 4.  The Defendant is sentenced to 3 years on the gun

specification, which merges with the gun specifications in Counts 1, 2, and 3, and 3 years on the

underylying offense to run consecutive to the sentence in Count 1 for an aggregate sentence of 36

years to life."  (Doc. No. 8-1, Exh. 21.)

**E.    Federal Habeas Petition**

On April 17, 2013, Bolan filed a Petition for Writ of Habeas Corpus and asserted the

following grounds for relief:

> GROUND ONE:        DENIAL OF 6th AND 14th AMENDMENT RIGHT TO
>                               PUBLIC TRIAL/STRUCTURAL ERROR.
>
> Supporting Facts:  During testimony of State's key witness, Ogletree, public
> was excluded from courtroom and petitioner was ordered by the court to not
> look at the witness.
>
> GROUND TWO:        DENIAL OF DUE PROCESS PURSUANT TO 5th and 14th
>                               AMENDMENTS DUE TO FAILURE OF TRIAL COURT
>                               TO HOLD HEARING ON MOTION FOR NEW TRIAL
>                               BASED ON NEWLY DISCOVERED EVIDENCE.
>
> Supporting Facts: Two days after the verdict of guilty, the State was
> contacted by one, Carlita Benson, who indicated that she witnessed the
> crime and petitioner Bolan was not the shooter.  State presented letter to
> defense counsel containing this information.  Court failed to hold hearing
> regarding this issue and denied motion for new trial.
>
> GROUND THREE:   APPELLANT WAS DENIED CONSTITUTIONAL
>                               RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
>                               ON DIRECT APPEAL.
>
> Supporting Facts: Appellant counsel failed to allege ineffectiveness of trial
> counsel for: (a) failure to object to closure of courtroom and order that
> petitioner not look at the witness; and (b) failure to secure attendants [sic] of
> exculpatory witness, Benson.

GROUND FOUR:    THE PETITIONER WAS DENIED EFFECTIVE
ASSISTANCE OF COUNSEL AT TRIAL AS
GUARANTEED BY THE 6TH AND 14TH AMENDMENTS
TO THE UNITED STATES CONSTIUTION.

Supporting Facts: Trial counsel failed in his essential duty to provide
effective assistance in the following regards: (a) failure to object to closure
of courtroom and order that petitioner not look at witness; and, (b) failure to
secure attendants [sic] of necessary exculpatory witness, Benson.

(Doc. No. 1.)  Respondent filed a Return on July 1, 2013.  (Doc. No. 8.)  Bolan, through counsel,

thereafter filed a Traverse on October 4, 2013.  (Doc. No. 13.)

### III.  Exhaustion and Procedural Default

**A.   Exhaustion Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas

corpus proceedings.  *See* 28 U.S.C. § 2254(b),(c).  This requirement is satisfied "when the

highest court in the state in which the petitioner was convicted has been given a full and fair

opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th

Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered

moot:  "If no remedy exists, and the substance of a claim has not been presented to the state

courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and

prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17 F.3d

155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

**B.   Procedural Default Standard**

Federal courts will not consider the merits of procedurally defaulted claims, unless the

petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure

to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v.*

*Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[3] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Lovins*, 712 F.3d at 295 ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state

---

[3] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

-10-

procedural rule.")  This second type of procedural default is often confused with exhaustion.

Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion

requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456

U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he

failed to use them within the required time period, procedural default and not exhaustion bars

federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction

proceedings where those claims could have been raised on direct appeal.  *Id*. Thus, if an Ohio

petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is

procedurally defaulted.  *Id*.

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court.

To fairly present a claim to a state court a petitioner must assert both the legal and factual basis

for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a

"petitioner must present his claim to the state courts as a federal constitutional issue--not merely

as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A

petitioner can take four actions in his brief which are significant to the determination as to

whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon

federal cases employing constitutional analysis; (2) reliance upon state cases employing federal

constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms

sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well

within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir.

2003).  *See also Ross v. Pineda*, 549 Fed Appx. 444, 453-454 (6th Cir. 2013).

A petitioner's procedural default, however, may be excused upon a showing of "cause"

-11-

for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138-39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id*. Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

**C. Application to Grounds Three and Four**

Respondent argues Grounds Three and Four are procedurally defaulted. With respect to Ground Four (ineffective assistance of trial counsel), Respondent maintains Bolan failed to present this claim on direct appeal to either the state appellate court or the Supreme Court of

Ohio.  With respect to Ground Three (ineffective assistance of appellate counsel), Respondent acknowledges this claim was raised in Bolan's 26(B) Application but notes that Bolan failed to appeal the denial of his Application to the Supreme Court of Ohio.  Respondent asserts state court remedies are no longer available to Bolan to present either of these Grounds and, therefore, both are defaulted.  Moreover, Respondent argues that, because Ground Three is itself defaulted, it may not serve as cause to excuse the default of Ground Four.  (Doc. No. 8 at 12-13.)

In his Traverse, Bolan "concedes that grounds Three and Four are indeed defaulted" and "does not argue that there is cause or prejudice to excuse the default."  (Doc. No. 13 at 5.)  Thus, Bolan states he is seeking relief on Grounds One and Two only.  *Id.*

Based on the above, it is recommended the Court find that Grounds Three and Four of Bolan's habeas Petition should be dismissed as procedurally defaulted or, in the alternative, that they have been voluntarily withdrawn.

### IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

-13-

28 U.S.C. § 2254(d) (1996). Clearly established federal law is to be determined by the holdings of the United States Supreme Court. *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett,* 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)) The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6; *Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id*. at 410-12. "This standard generally requires that federal courts

-14-

defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, ––– U.S. ––––, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id*. at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

**A.  Ground One:**

In his first ground for relief, Bolan argues the state appellate court unreasonably applied clearly established federal law when it affirmed the trial court's decision to close the courtroom to the public during the testimony of State witness Helen Ogletree.[4]  (Doc. No. 1 at 6.)  He also

---

[4]  On direct appeal, Bolan argued the trial court violated his Sixth Amendment right to a public trial when it closed the courtroom during the testimony of both Ogletree and State witness Arthur Smiley.  In his habeas Petition, however, Bolan limits his argument to

-15-

argues the trial court violated his right to confrontation when it ordered Bolan not to look at

Ogletree during her testimony.  *Id.*

On direct appeal, the state appellate court considered these claims as follows:

{¶ 58} In the sixth assignment of error, Bolan argues the trial court denied his right to public trial by closing the courtroom during the testimony of Ogletree and Smiley.  He argues the trial court did not place any particular reasons on the record justifying the closure.  He further argues that the court abused its discretion when it ordered him to refrain from looking at Ogletree while she testified.

{¶ 59} "The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution."  *State v. Drummond*, 111 Ohio St.3d 14, 2006–Ohio–5084, 854 N.E.2d 1038, ¶ 49.  Public trials ensure that the judges and prosecutors carry out their duties responsibly, encourage witnesses to come forward, and discourage perjury.  *Waller v. Georgia* (1984), 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31, citing *In re Oliver* (1948), 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682.  "The violation of the right to a public trial is structural error [that affects the framework of trial] and not subject to harmless-error analysis." *Drummond* at ¶ 50.

{¶ 60} We note that "[t]he right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice.  A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings."  *Id*. at ¶ 51.  Thus, we review the trial court's decision to remove the public from a courtroom under an abuse of discretion standard of review.  *Id*. at ¶ 58; *State v. Brown* (Nov. 25, 1998), Cuyahoga App. No. 73060.

{¶ 61} In *Waller*, the seminal case regarding the right to a public trial, the trial court closed a suppression hearing to all persons other than witnesses, court personnel, the parties, and counsel.  The United States Supreme Court set forth the following four-pronged test that courts must use to determine whether closure of a courtroom is necessary:

"[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable

---

alleged constitutional violations stemming from the closure of proceedings during Ogletree's testimony.  (Doc. No. 1 at 6.)

alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." *Waller* at 48.

{¶ 62} In the instant case, the trial court ordered that all spectators be removed from the courtroom during the testimony of Ogletree and Smiley.  The State requested that the courtroom be cleared of all spectators during Ogletree's testimony.  When discussing the State's request with the trial court, defense counsel stated that he did not "believe [the closure of the courtroom] presents any prejudice to [Bolan.] * * * The only logistical problem [defense counsel] would see * * * is that [Ogletree] then be called to testify after the course of a normal break, so as to effect having the courtroom cleared, before the jury returns to this courtroom."  The trial court responded, "[t]hat could be accommodated. We can do it after a break.  If we do, would that mean that you waive any prejudice by the courtroom being emptied at the time [Ogletree] is testifying?"  Defense counsel replied, "[a]bsolutely."  Then prior to Ogletree's testimony, the trial court stated that it does not "want [Bolan's] gaze directed at [Ogletree] at all. If there is, there will be some sort of sanctions."

{¶ 63} With respect to Smiley, defense counsel requested the trial court close the courtroom during the hearing determining whether Smiley would testify.  Defense counsel stated, "I would ask this Court to please have the courtroom cleared for this proceeding * * * it's been demonstrated in this trial that people in the neighborhood and associated with either family in this case have had a reluctance to be candid with witnesses, whether for admitting different stories, or for fear of retribution.  Whatever the issues are, I just think it would be clearer if there wasn't anybody involved except those people that have to be."  The State did not object, and the trial court granted the motion.

{¶ 64} In *Drummond,* the Ohio Supreme Court reviewed two closures by the trial court.  In applying the *Waller* factors to the first closure, the *Drummond* court found that all four factors were satisfied and the trial court did not abuse its discretion in ordering the limited closure of the courtroom.  *Id*. at ¶ 58.  However, with respect to the second closure, the *Drummond* court noted that "the defense did not object to the trial court's action.  Defense counsel were present during the entire proceedings and were fully aware of the exclusion of the spectators from the courtroom."  *Id*. at ¶ 59.  Thus, the court held that defense "counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial during [the witness's] testimony.  *See Peretz v. United States* (1991), 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808, citing *Levine v. United States* (1960), 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989." *Id*.

{¶ 65} Here, just as in *Drummond*, the defense did not object to the closure of the courtroom.  With respect to Ogletree, defense counsel consented to the closure and acknowledged that Bolan waived any prejudice by the courtroom

-17-

being emptied at the time Ogletree testified. With Smiley, defense counsel requested that the courtroom be closed during his testimony. The State did not object, and the trial court granted the request. "Such circumstances dispel any reasonable claim of prejudice to this defendant and strongly indicate that this order was made for the benefit of the defense and with its active support." *Bayless* at 110. Thus, defense counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial during Ogletree's and Smiley's testimony.

{¶ 66} Based on the foregoing, we conclude that Bolan's Sixth Amendment right to a public trial was not violated.

*State v. Bolan*, 2011 WL 3925584 at * 11-13.

Bolan argues the state courts should have clearly analyzed and made express findings regarding each of the four *Waller* criteria "not despite lack of objection, but *because of* no objection from the defense." (Doc. No. 13 at 7) (emphasis in original). Specifically, he maintains that "structural error such as this may not be waived without satisfying the protections established by the Supreme Court" in *Waller. Id.* He argues that, if the state appellate court had properly applied that test, it "would have concluded that closure was unwarranted, weighing the minimally stated need against the great constitutional principle at stake." *Id.* Bolan further asserts the Supreme Court cases relied upon by the state appellate court regarding waiver are distinguishable, arguing they do not stand for the proposition that "the right to public jury trial may be waived without reference to *Waller*, or at very least, some dialogue with the defendant." *Id.* at 8-9. Finally, Bolan maintains the state appellate court failed entirely to address his argument that the trial court erred in ordering him not to look at Ogletree and, therefore, this Court should review that claim *de novo. Id.* at 9-10.

Respondent argues the state appellate court reasonably interpreted Supreme Court precedent to find that the lack of objection to closing a courtroom results in the waiver of the

Sixth Amendment right to a public trial.  (Doc. No. 8 at 18.)  He further argues that, in light of this precedent, it was not unreasonable for the state appellate court to find that the trial court did not have to specifically analyze each of the four *Waller* criteria.  *Id.* at 18-19.

The Sixth Amendment guarantees a criminal defendant the right to a public trial.  U.S. Const. Amend. VI.   As the Supreme Court has explained, "[a]n open courtroom is necessary to preserve and support the fair administration of justice because it encourages witnesses to come forward and be heard by the public, discourages perjury by the witnesses, and ensures that the judge and prosecutor will carry out their duties properly."  *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).  Further, a public trial permits the general public to observe that the accused is "fairly dealt with and not unjustly condemned, and that the presence of the interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."  *Id*. at 43.

In *Waller*, the Supreme Court held the right to a public trial applied to suppression hearings and set forth a four-prong test to determine whether a courtroom closure violates the Sixth Amendment: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] [the trial court] must make findings adequate to support the closure."  *Id*. at 48.  *See also Presley v. Georgia*, 558 U.S. 209, 214, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010) (same).

As the Sixth Circuit recently explained, while a violation of the right to a public trial is a structural error, the right itself is not absolute:

> Violation of the right to a public trial is a structural error, meaning it is not subject to harmless-error review.  *Waller,* 467 U.S. at 49 n. 9, 104 S.Ct. 2210; *Johnson v.*

-19-

> *Sherry*, 586 F.3d 439, 443 (6th Cir. 2009). A structural error is a "defect affecting
> the framework within which the trial proceeds, rather than simply an error in the
> trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246,
> 113 L.Ed.2d 302 (1991). While an important structural right, *Johnson*, 586 F.3d at
> 444, the right to a public trial is not absolute, and closure of a courtroom may be
> justified by "an overriding interest based on findings that closure is essential to
> preserve higher values and is narrowly tailored to serve that interest,"
> *Press–Enter. Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 510,
> 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (internal quotation marks omitted).

*Nolan v. Money*, 534 Fed. Appx. 373, 379 (6th Cir. Aug. 9, 2013).  *See also Waller*, 467 U.S. at

45 ("[T]he right to an open trial may give way in certain cases to other rights or interests, such as

the defendant's right to a fair trial or the government's interest in inhibiting disclosure of

sensitive information"); *Presley*, 558 U.S. at 213 (same).  Courts have held, in particular, that

"the need to protect a witness from intimidation justifies closure of the courtroom."  *Nolan*, 534

Fed. Appx. at 380 (citing *United States v. Brazel*, 102 F.3d 1120, 1156 (11th Cir. 1997).  *See also*

*Johnson v. Sherry*, 465 Fed. Appx. 477, 479 (6th Cir. Feb. 29, 2012); *United States v. Eisner*, 533

F.2d 987, 993-994 (6th Cir. 1976) (trial court did not abuse its discretion in excluding certain

spectators for limited portion of trial where witness had fear of testifying); *Porter v. Konteh*,

2009 WL 4282911 at * 15 (N.D. Ohio Nov. 30 2009) ("Prior cases have justified closure of a

court due to the fears of a witness testifying . . . and witness intimidation by

spectators")(citations omitted).

   Moreover, and of particular relevance to the instant matter, the Supreme Court has held

that the right to a public trial can be waived when a defendant fails to object to the closure of the

courtroom.  *See e.g. Levine v. United States*, 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989

(1960) (finding that "[t]he continuing exclusion of the public in this case is not deemed contrary

to the requirements of the Due Process Clause without a request having been made to the trial

judge to open the courtroom"); *Peretz v. United States*, 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (stating that "[t]he most basic rights of criminal defendants are similarly subject to waiver," and parenthetically describing *Levine* as holding that "failure to object to closing of courtroom is waiver of right to public trial"); *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 896, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) ("[T]he Sixth Amendment right to a trial that is 'public,' provide[s] benefits to the entire society more important than many structural guarantees; but if the litigant does not assert [it] in a timely fashion, he is foreclosed") (Scalia, J., concurring).

The Sixth Circuit has also found that "[w]hile we agree that the right to a public trial is an important structural right, it is also one that can be waived when a defendant fails to object to the closure of the courtroom, assuming the justification for closure is sufficient to overcome the public and media's First Amendment right to an open and public trial proceeding." *Johnson v. Sherry*, 586 F.3d 439,444(6thCir. 2009). *See also Porter*, 2009 WL 428911 at * 1 ("Petitioner waived his right to a public trial when his counsel did not object to the closure of the courtroom, and even agreed with the trial judge's decision"); *Tillman v. Bergh*, 2008 WL 6843654 at * 15 (E.D. Mich. July 2, 2008) ("Taken together, *Levine* and *Waller* establish that '[w]here a defendant, with knowledge of the closure, fails to object, that defendant waives his right to a public trial'" (quoting *U.S. v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006)); *Degraffinreid v. Lafler*, 2006 WL 2162204 at * 4 (E.D. Mich. July 31, 2006) ("A party may waive the Sixth Amendment right to a public trial").

Here, the record reflects that, on the third day of trial (Wednesday August 25, 2010), the following exchange occurred between the trial court and counsel regarding the issue of Ms.

Ogletree's testimony:

THE COURT: \* \* \* We are in chambers.  Counsel is present. The defendant is not.  Are you waiving his presence?

MR. CHESELKA: Waiving his presence, your Honor.

THE COURT: Thank you.  We are here to discuss the testimony of Helen Ogletree, who is a State's witness, she is on the defense's witness list, who is currently incarcerated, and is expected to testify this afternoon.  I understand that the State wishes to address the Court regarding Miss Ogletree's testimony. Mr. Filiatraut.

MR. FILIATRAUT: Yes, Judge. Thank you.  Your Honor, during a morning break this morning, Detective Sandoval and I met with Helen Ogletree in a holding cell up here on the floor.  And Helen Ogletree conveyed to Detective Sandoval and myself that she is vehemently afraid to testify in this case against Raymond Bolan, who she knows as Ray Ray from the neighborhood.

She is extremely afraid of Ray Ray.  But she is also afraid there will be spectators in the courtroom.

The Court is very familiar with the holding cell area up on 15 here.  She's being held in an area adjacent to where the defendant is being held.

Helen Ogletree told Detective Sandoval and myself that she overheard Ray Ray, the defendant, talking about his girlfriend being in the courtroom.  And that made her, specifically, extremely afraid of other people being in the courtroom while she testifies.

She does not want her mother to face any retribution, or her sons, who both still live at the same address, which is right down there on Central.  She then asked Detective Sandoval and myself if we could assist in getting them moved to different CMHA property, because of this case.

So, for these reasons, Judge, I'm asking that this Court, that the courtroom be cleared of all spectators– that would include people that are here for my side as well– all

-22-

spectators be cleared, except of course the defendant should remain in court while Helen Ogletree testifies.

THE COURT: Thank you. We discussed this in chambers before we came on the record. [Defense attorney] Cheselka, I understand that you wish to address the record as well.

MR. CHESELKA: Thank you, Judge. Your Honor, I echo the sentiments that you first brought up when we were discussing this, which is as an officer of the Court, I too completely believe Mr. Filiatraut, and would share any concern for anyone's safety in a courtroom.

On the surface, and the issue being presented here, **I do not believe presents any prejudice to my client, in so far as this jury trial. The only logistical problem I would see– this is what I'm asking for, is that she then be called to testify after the course of a normal break, so as to effect having the courtroom cleared, before the jury returns to this the courtroom.**

**The only scene I'm trying to prevent, and the only prejudice I can see for my client is if before Miss Ogletree is called in, the Court would make an issue out of the fact that everyone has to get up and leave, and have the jury, without any reason, to make some sort of inference or draw a conclusion from the fact that the courtroom had to be emptied.**

**THE COURT: That can be accommodated. We can do it after a break.**

**If we do, would that mean that you would waive any prejudice by the courtroom being emptied at the time Miss Ogletree is testifying?**

**MR. CHESELKA: Absolutely**.

THE COURT: Thank you. Does that resolve this issue?

MR. FILIATRAUT: I believe it does.

MR. CHESELKA: I believe so.

(Doc. No. 8-5 at 41-44) (emphasis added). Later in the day, after a break but before the jury was

-23-

returned to the courtroom, the trial court asked all spectators to vacate the courtroom, stating "[t]his has been agreed to by the parties, and it's for a determination that has been made by the Court for purposes of safety and security." *Id*. at 161.

Once the courtroom had been cleared, and outside the presence of the jury, the trial court stated as follows: "I don't want the defendant's gaze directed to [Ms. Ogletree] at all. If there is, there will be some sort of sanction." *Id*. at 166. The jury was then returned to the courtroom. *Id*. The State called Ms. Ogletree as a witness and questioned her regarding her knowledge of the incident in question. *Id.* at 167 - 177. Bolan's trial counsel thereafter cross-examined her at length. *Id*. at 177-189, 190-192. Bolan remained in the courtroom throughout her testimony. *Id*. at 167-192. The Court then adjourned for the day. *Id*. at 192-193. While is not clear precisely how long the courtroom was closed, the record reflects Ms. Ogletree's testimony consists of 25 pages of transcript.[5] *Id*. at 167-192.

Upon careful consideration, the Court finds the state appellate court's determination that Bolan waived his Sixth Amendment right to a public trial during Ogletree's testimony was not an unreasonable application of clearly established federal law. Although acknowledging the four part test set forth in *Waller,* the state appellate court relied on the Ohio Supreme Court's decision in *Drummond* to find that Bolan had waived his right to a public trial by failing to object to the closure of the courtroom during Ogletree's testimony. The *Drummond* decision, in turn, relies on the Supreme Court's decisions in *Levine* and *Peretz.* In *Levine*, a witness (Levine) refused to

---

[5] As noted *supra*, Bolan's trial was five days long, beginning on Monday, August 23, 2010 and concluding on Friday, August 27, 2010. (Doc. No. 8- 2 through 8-7.) According to the Court's calculations, there are 770 pages of trial transcript between the empanelment of the jury (Doc. No. 8-3 at 86) and the conclusion of closing arguments (Doc. No. 8-7 at 150.)

answer questions before a federal grand jury, despite being offered immunity from prosecution. *Levine*, 362 U.S. at 611-612.  Levine was then brought before the trial judge, which closed the courtroom for the proceedings.  *Id.* at 612.  Acting as "the Court and the Grand Jury," it asked Levine the specific questions he had previously refused to answer.  *Id.* at 613.  When he again refused to answer, the trial court asked counsel to explain why Levine should not be held in contempt.  *Id.*  After hearing counsel's arguments, the trial court found Levine in contempt and sentenced him to one year incarceration.  *Id.* at 614.  At no time did Levine or his counsel object to the closure of the proceedings.  *Id.*

The Supreme Court first found that "[i]t was surely not error for the judge initially to have cleared the courtroom," in light of the fact that "a necessary initial step in the proceedings was to read the record of the morning's grand jury proceedings."  *Id.* at 614-615.  However, the question remained "whether it was error, once the courtroom had been properly, indeed necessarily cleared, for petitioner's contempt, summary conviction and sentencing to occur without inviting the general public back into the courtroom."  *Id.* at 615.  Although the Court acknowledged that the Sixth Amendment was not directly applicable because the contempt proceeding was not a "criminal prosecution," the Court found that "due process demands appropriate regard for the requirements of a public proceeding in cases of criminal contempt."  *Id.* at 616.

The Court then found as follows:

**Had petitioner requested, and the court denied his wish, that the courtroom be opened to the public before the final stage of these proceedings we would have a different case.**  Petitioner had no right to have the general public present while the grand jury's questions were being read.  However, after the record of the morning's grand jury proceedings had been read, and the six questions put to petitioner with a direction that he answer them in the court's presence, there was

no further cause for enforcing secrecy in the sense of excluding the general public. Having refused to answer each question in turn, and having resolved not to answer at all, petitioner then might well have insisted that, as summary punishment was to be imposed, the courtroom be opened so that the act of contempt, that is, his definitive refusal to comply with the court's direction to answer the previously propounded questions, and the consequent adjudication and sentence might occur in public.  *See Cooke v. United States*, 267 U.S. 517, 534—536, 45 S.Ct. 390, 394—395, 69 L.Ed. 767.  **To repeat, such a claim evidently was not in petitioner's thought, and no request to open the courtroom was made at any stage of the proceedings**.

**The continuing exclusion of the public in this case is not to [be] deemed contrary to the requirements of the Due Process Clause without a request having been made to the trial judge to open the courtroom at the final stage of the proceeding, thereby giving notice of the claim now made and affording the judge an opportunity to avoid reliance on it.**  This was not a case of the kind of secrecy that deprived petitioner of effective legal assistance and rendered irrelevant his failure to insist upon the claim he now makes.  Counsel was present throughout, and it is not claimed that he was not fully aware of the exclusion of the general public.

*Id*. at 618-619 (emphasis added).  Over thirty years later, in *Peretz*, the Supreme Court noted that

"[t]he most basic rights of criminal defendants are similarly subject to waiver" and parenthetically

described *Levine* as standing for the proposition that the "failure to object to closing of courtroom

is waiver of right to public trial."  *Peretz*, 501 U.S. at 937.

Bolan attempts to distinguish these cases by arguing that neither *Levine* nor *Peretz*

"involved circumstances that would constitute structural error as they arose in proceedings that

are very different from a public jury trial, as here."  (Doc. No. 13 at 8.)  He further maintains that

"clearly neither of these cases stand for the proposition that the right to public jury trial may be

waived without reference to *Waller*, or, at the very least, some dialogue with the defendant."  *Id.*

Bolan's attempts to distinguish *Levine* and *Peretz* are unavailing.  Bolan cites no law,

much less any clearly established federal law, indicating the state appellate court's reliance on

*Levine* and *Peretz* was unreasonable.  The state appellate court reasonably construed these cases

-26-

as holding that Bolan's failure to object to the closure of the courtroom during Ogletree's testimony operated as a waiver of the right to a public trial.  Bolan does not direct this Court's attention to any Supreme Court precedent suggesting these cases are inapplicable because they were not decided in the context of a criminal jury trial.  Indeed, the Sixth Circuit has expressly rejected this reasoning.  In *Johnson*, that court found that, although the right to a public trial during criminal contempt proceedings at issue in *Levine* derived from due process rather than the Sixth Amendment, "the [Supreme] Court has never stated that its forfeiture holding was limited to public trials guaranteed by the Due Process Clause rather than the Sixth Amendment."  *Johnson*, 465 Fed. Appx. at 480.  It further noted that "the [Supreme] Court has continued to cite *Levine* even after its decision in *Waller*."  *Id.* (citing *Peretz*, 501 U.S. at 936).  Thus, the Court finds this argument to be without merit.

Bolan nevertheless argues the state appellate court erred because it affirmed the closure of the courtroom where the trial court failed to clearly articulate findings as to each of the four *Waller* criteria.  As noted above, because Bolan failed to object, the state appellate court reasonably relied on *Levine* and *Peretz* as the controlling Supreme Court precedent, thus obviating the need for discussion of the four *Waller* criteria.  However, even assuming such criteria were required to be met, a review of the trial transcript reflects the court closed the proceedings because of Ogletree's fear of Bolan and the possibility that friends of his would be present during her testimony.  (Doc. No. 8-5 at 41-44.)  Specifically, the prosecutor explained that Ogletree was housed in a holding cell adjacent to Bolan and had overhead him state his girlfriend would be in the courtroom.  *Id.*  The prosecutor further indicated this made Ogletree "vehemently afraid" to testify, particularly since her mother and sons continued to reside in the CMHA

-27-

housing project where the incident occurred.  *Id.*  While the trial court did not specifically articulate that assuaging Ogletree's fear satisfied the first *Waller* criteria, it did subsequently explain it was clearing the courtroom "for purposes of safety and security."  (Doc. No. 8-5 at 161.)  As noted *supra*, the Sixth Circuit has found that "the need to protect a witness from intimidation justifies closure of the courtroom."  *Nolan*, 534 Fed. Appx. at 380.  *See also Johnson,* 465 Fed. Appx. at 479; *Eisner*, 533 F.2d at 993-994; *Porter,* 2009 WL 428911 at * 15.

Moreover, and with respect to the second *Waller* criteria, there is no indication (and Bolan does not argue) that the closure was broader than necessary under the circumstances.  Indeed, in *Johnson*, the Sixth Circuit recently upheld a state court's determination that closure of a courtroom to all spectators during the testimony of three witnesses was not broader than necessary, noting "the goal was to assuage the testifying witnesses' fears; the court could have reasonably concluded that they would be afraid to tell the truth if anyone unknown to them was watching."  *Johnson*, 465 Fed. Appx. at 479.  Similarly, here, the prosecutor explained that Bolan's indication his girlfriend would be in the courtroom "made [Ogletree] . . . extremely afraid of *other people* being in the courtroom while she testifies."  (Doc. No. 8-5 at 41-42.)  In light of this exchange, it was reasonable to conclude that closure to all spectators was necessary under the circumstances.

As to the third *Waller* criteria, the Sixth Circuit recently found a state court need not *sua sponte* consider reasonable alternatives where a petitioner fails to object to the closure of the courtroom:

> At the time of its decision, the state court faced two relevant precedents pointing in different directions. *Waller* stated that "the trial court must consider" alternatives, but did not explicitly say that the court must do so even when the defendant consents to closure.  (The defendant objected to closure in *Waller*.)

Since the time of the state court's decision here, the Supreme Court has clarified that *when a party objects* to closure, but does not propose alternatives, the judge must think of some *sua sponte. See Presley v. Georgia*, —— U.S. ——, ——, 130 S.Ct. 721, 724, 175 L.Ed.2d 675 (2010). Indeed, *Presley* said that *Waller* was "clear" on this point. *Id*. But the situation here was different. Johnson, through counsel, affirmatively consented to closure and waived his objection in the trial court. And thus a different Supreme Court case arguably controlled. In *Levine v. United States*, 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960), the trial court adjudicated the defendant's criminal contempt proceeding with a closed courtroom. *See id.* at 618, 80 S.Ct. 1038. The defendant made "no request to open the courtroom[.]" *Id*. Indeed, he raised the public trial claim "only as an afterthought on appeal." *Id*. at 620, 80 S.Ct. 1038. In these circumstances, the Court held, the trial judge need not have opened the courtroom "on his own motion[.]" *Id*. at 619, 80 S.Ct. 1038. Thus, **the state court could reasonably think that when a defendant consents and thereby provides no "notice of the claim," the "onus" will not be on the trial court to fulfill all the same requirements that apply when a defendant objects.** *Id.*

*Johnson*, 465 Fed. Appx. at 479-480 (emphasis added). In light of the above, and the uncontroverted fact that Bolan did not object to closure of the courtroom, the Court finds it was reasonable for the trial court to assume it was not required to *sua sponte* consider other reasonable alternatives to complete closure of the courtroom during Ogletree's testimony.[6]

Finally, the fourth *Waller* criteria requires that the trial court make adequate findings to support the closure. *Waller*, 467 U.S. at 48. Again, Bolan cites no clearly established federal law indicating the trial court was required to do so in light of his failure to object to closure of the courtroom. However, even assuming there was such an obligation, the Court finds the on-the-

---

[6] Unlike in *Johnson*, the Supreme Court had decided *Presley* by the time of the state appellate court decision herein. As noted above, *Presley* found that, when a party objects to closure but does not propose alternatives, a trial court must *sua sponte* consider reasonable alternatives. *Presley*, 558 U.S. at 214. Here, however, Bolan did not object to closure and, thus, *Levine* controlled. Moreover, the Court notes Bolan requested the courtroom be closed to all spectators during the testimony of Arthur Smiley, thereby not only failing to suggest alternatives but implicitly indicating that complete closure was appropriate under the circumstances of the case.

-29-

record exchange between the trial court, prosecutor, and Bolan's counsel was sufficient to satisfy this criteria. *See Johnson*, 465 Fed. Appx. at 480 (finding that "[t]he Michigan court was not unreasonable in concluding that the on-the-record exchange between the judge, the prosecutor, and Johnson's counsel served this purpose.")

Accordingly, and for all the reasons set forth above, the Court rejects Bolan's argument that the state appellate court unreasonably applied clearly established federal law when it affirmed the trial court's decision to close the courtroom during Ogletree's testimony.

Finally, Bolan argues the trial court violated his right to confrontation when it ordered him not to look at Ogletree during her testimony. (Doc. No. 13 at 9-10.) He maintains this issue was specifically raised on direct appeal but, because the state appellate court failed to address it, is now subject to *de novo* review. *Id*. at 10.

As an initial matter, the Court finds Bolan has failed to sufficiently develop his argument with respect to this issue. The entirety of his argument is contained in one paragraph, with no citations to any relevant legal authority supporting his perfunctory statement that the trial court violated his confrontation rights by ordering him to avert his gaze while Ogletree testified. (Doc. No. 13 at 10.) The Court finds Bolan's undeveloped reference to an alleged violation of his confrontation rights is insufficient and, therefore, the issue is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Hayward v. Cleveland Clinic Foundation*, 2014 WL 3558095 at * 17, fn 9 (6th Cir. July 21, 2014); *Murray v. Mary Glynn Homes, Inc*., 2013 WL 4054595 at * 6 (N.D.

-30-

Ohio Aug. 12, 2013).

Moreover, even if the Court were to consider this issue, it would find Bolan's "argument" to be without merit.  The Confrontation Clause provides that in "all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  The Supreme Court has explained that this clause "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (plurality opinion) (citing *Delaware v. Fensterer*, 474 U.S. 15, 18–19, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). "The Confrontation Clause has been violated if there was interference with the defendant's opportunity for effective cross-examination."  *Nolan v. Money*, 2011 WL 219911 at * 14 (citing *Kentucky v. Stincer*, 482 U.S. 730, 740, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)).

 Here, it is undisputed Bolan was present in the courtroom throughout Ogletree's testimony and his counsel was fully afforded the opportunity to cross-examine.  (Doc. No. 8-5 at 42-43, 177-189, 190-192.)  Moreover, Bolan does not argue (and cites no authority in support of the proposition) that the trial court's admonition that he not look at Ogletree interfered with his opportunity to cross-examine.

Accordingly, the Court finds this issue to be waived and, in any event, without merit.

**B.  Ground Two**

In his second ground for relief, Bolan argues the trial court erred in refusing to hold a hearing on his motion for new trial based on newly discovered evidence.  (Doc. No. 1 at 8.)  He maintains that, two days after the jury returned a guilty verdict, the State provided a letter to

-31-

defense counsel in which it was "revealed that the prosecutor had been contacted by a witness, Carlyeliea Benson, who told them that Bolan was not the shooter and she saw the actual shooter on the street on the day Mr. Bolan's trial ended." (Doc. No. 13 at 10.) Bolan argues he presented the letter to the trial court as part of his motion for new trial, and requested a hearing based on newly discovered evidence. Bolan maintains the trial court violated his due process rights by denying the motion without a hearing.

### 1. Cognizability

The Court notes initially that, to the extent Bolan is challenging the denial of his motion for new trial without a hearing on state law grounds, such a claim is not cognizable on federal habeas review. It is well-established that, in conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). As such, the Supreme Court has explained "it is not the province of a federal habeas court to reexamine state-court decisions on state-law questions." *Id*. at 67-68. *See also Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Thus, on habeas review, this Court may only consider a claim of federal constitutional error stemming from the denial of Bolan's motion for new trial.

In his petition, Bolan argues he was "denied due process by the failure of the trial court to even hold a hearing to determine the merits" of his motion, particularly since "the [newly discovered] evidence underlying the motion went directly to the issue of guilt or innocence and was relevant *Brady* material." (Doc. No. 13 at 11-12.) Because Bolan filed his motion for new trial before he filed his direct appeal, and the state appellate court considered and reviewed the

denial of that motion on direct appeal, habeas relief is available for Bolan's federal due process claim relating to the denial of his motion for new trial.  *See Pudelski v. Wilson*, 576 F.3d 595, 610 (6ᵗʰ Cir. 2009).[7]   In order to establish a due process violation, Bolan must demonstrate that the trial court's denial of his motion for new trial was "so egregious" that it violated his right to a fundamentally fair trial.  *Id*. (citing *Fleming v. Metrish*, 556 F.3d 520, 535 (6ᵗʰ Cir. 2009) and *Baze v. Parker*, 371 F.3d 310, 324 (6ᵗʰ Cir. 2004)).

### 2.       Procedural Default

Before the Court may consider Bolan's federal due process claim, however, Bolan must demonstrate that he fairly presented it to the state courts.  Bolan maintains that he did, arguing he "raised this allegation *both* as an improper ruling under Ohio law (abuse of discretion) and a Due Process violation." (Doc. No. 13 at 12.)  He notes that, in his appellate brief, he cited *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and states he "specifically argued that the proffered evidence supporting his motion for new trial undermined confidence in the outcome of the trial." *Id*.

Before the Sixth Circuit has explained the concept of "fair presentation" as follows:

> Ordinarily, state prisoners must exhaust available state remedies by, among other things, fairly presenting their federal claims to the state courts before petitioning for a federal writ of habeas corpus.  *See* 28 U.S.C. § 2254(b), (c); *Whiting v. Burt*,

---

[7] In *Pudelski*, the Sixth Circuit held that "[w]hen a state defendant files a motion for new trial before filing a direct appeal, and when the denial of that motion is then consolidated with and reviewed during the direct appeal, the motion for new trial is part of the original criminal proceedings and is not a collateral proceeding." *Pudelski*, 576 F.3d at 610. Thus, the general rule announced in *Kirby v. Dutton*, 794 F.2d 245 (6ᵗʰ Cir. 1986) that habeas relief is not available to challenge alleged errors in state post-conviction proceedings, is not applicable.  *Id*. at 608-610.

> 395 F.3d 602 (6th Cir. 2005).  Due to longstanding policies of comity and respect
> between state and federal courts, a habeas petitioner must give the state courts the
> first opportunity to consider and rule upon the federal claims the prisoner wishes
> to use to attack his state court conviction.  *Picard v. Connor*, 404 U.S. 270, 275,
> 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). A petitioner need not cite federal law "book
> and verse" to fairly present a claim, *id*. at 278, 92 S.Ct. 509, but the factual and
> legal underpinnings of the claim must be presented as a federal claim to the state
> courts,  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000).

*Pudelski*, 576 F.3d at 605.  A petitioner can take four actions in his brief which are significant to

the determination as to whether a claim has been fairly presented as a federal constitutional

claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state

cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional

law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4)

alleging facts well within the mainstream of constitutional law." *Newton*, 349 F.3d at 877.  *See*

*also Pudelski*, 576 F.3d at 605-606; *McMeans*, 228 F.3d at 681.

"Bald assertions in brief headings alleging a constitutional violation are insufficient to

constitute fair presentment." *Kirksey v. Clipper*, 2014 WL 1117834 at * 9 (N.D. Ohio March 17,

2014) (citing *Blackmon v. Booker*, 394 F.3d 399, 400-401 (6th Cir. 2004)).  Rather, a petitioner

must "develop [] cogent arguments regarding those rights beyond the naked assertion that they

were violated." *Blackmon*, 394 F.3d at 400-401.  Moreover, "[g]eneral allegations of the denial

of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific

constitutional rights were violated." *McMeans*, 228 F.3d at 681.

Where a petitioner has failed to fairly present a federal claim to the state courts, and a

state procedural rule now prohibits the state court from considering it, the claim is procedurally

defaulted. *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002).  "While in such situations the

exhaustion requirement is technically satisfied because there are no longer any state remedies

-34-

available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal court review." *Pudelski*, 576 F.3d at 605.

The Court finds Bolan failed to fairly present his second ground for relief to the state courts as a federal due process claim. Bolan did challenge the denial of his motion for new trial on direct appeal to the state appellate court. (Doc. No. 8-1 at 50-52, Exh. 7). However, he did so on the basis of state law only and did not fairly present this claim to the state appellate court as a federal due process violation. Bolan's fifth assignment of error on direct appeal asserts the trial court "abused its discretion" when it failed to grant appellant's motion for new trial without a hearing. (Doc. No. 8-1 at 50.) It does not clearly assert a due process violation or reference any specific provision of the United States Constitution. Indeed, the words "due process" do not appear anywhere in Bolan's argument with respect to this claim.[8] While Bolan does cite to the Supreme Court cases of *Kyles* and *Brady*, those cases involved due process claims relating to the suppression by the prosecution of material, exculpatory evidence. Here, there is no suggestion that the State suppressed exculpatory evidence and, indeed, Bolan did not assert a *Brady* claim either during direct appeal or in the instant habeas petition.[9] Thus, it is not surprising that the

---

[8] Bolan did argue, on direct appeal to the state appellate court, that the trial court's "refusal to secure the attendance of an essential witness or grant a reasonable continuance for this purpose" denied him a meaningful opportunity to present a complete defense, in violation of (among other things) the Due Process Clause. (Doc. No. 8-1 at 46-50.) However, this is a different claim from Bolan's habeas claim that the trial court violated his due process rights by denying his motion for new trial.

[9] Indeed, in his appellate brief, Bolan acknowledges the State provided the defense with copies of Ms. Benson's descriptions (both oral and written) of the shooter during the

state appellate court failed to consider whether the trial court's denial of Bolan's motion for new trial constituted a violation of his federal due process rights.

On direct appeal to the Ohio Supreme Court, Bolan did argue that the denial of his motion for new trial without a hearing violated his state and federal due process rights, citing the Fifth and Fourteenth Amendments to the United States Constitution and *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).[10]  (Doc. No. 8-1 at 152-154.)  However, the Ohio Supreme Court will not ordinarily consider a constitutional question which was not raised and argued in the lower courts.  *Gatlin v. Clipper*, 2014 WL 3670115 at * 2 (N.D. Ohio July 21, 2014) (citing *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *State v. Phillips*, 27 Ohio St.2d 294, 302, 272 N.E.2d 347, 352 (1971)).  *See also Nesser v. Wolfe*, 2007 WL 1792255 at * 9 (S.D. Ohio June 19, 2007).

Thus, Bolan did not fairly present his due process claim through the requisite levels of appellate review and there does not appear to be any avenue of state relief remaining to him. The Court therefore finds Bolan's second ground for relief is procedurally defaulted and, further, that there is no indication of cause or prejudice to excuse the default.[11]  *See Wright v. Lazaroff*, 643 F.Supp.2d 971, 986 (S.D. Ohio 2009) ("If petitioner fails to fairly present his claims through

---

discovery process.  (Doc. No. 8-1 at 50.)  Moreover, the "new" evidence at issue (Ms. Benson's statements to the prosecution after the conclusion of trial) was promptly communicated to the defense.

[10] As noted above, the Ohio Supreme Court dismissed Bolan's appeal as not involving any substantial constitutional question.  (Doc. No. 8-1, Exh. 16.)

[11]The Sixth Circuit has recognized that a habeas court may *sua sponte* raise the issue of procedural default.  *See e.g. Howard v. Bouchard*, 405 F.3d 459, 475 (6th Cir. 2005); *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).  However, as Bolan has not had the opportunity to specifically address this procedural issue, the Court will also address the merits of his claim.

the requisite levels of state appellate review to the state's highest court . . . ., and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue his claims in the state courts, the claims are subject to dismissal with prejudice as waived").

### 3.     Merits

Because Bolan did not fairly present it as such, the state appellate court did not consider whether the denial of Bolan's motion for new trial constituted a violation of his federal due process rights.  Having said that, however, it is not clear that the state appellate court's analysis of this claim would have been appreciably different had it, in fact, analyzed the claim under federal due process principles.   In considering this claim, the state appellate court reasoned as follows:

> {¶ 49} In the fifth assignment of error, Bolan argues the trial court erred when it denied his motion for a new trial based on newly discovered evidence.

> {¶ 50} A motion for a new trial is addressed to the sound discretion of the trial court, and the court's ruling on the motion will not be disturbed on appeal absent an abuse of discretion. *State v. Matthews*, 81 Ohio St.3d 375, 378, 1998–Ohio–433, 691 N .E.2d 1041, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus.

> {¶ 51} To warrant the granting of a new trial on the grounds of newly discovered evidence, " 'it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.' " *State v. Barnes*, Cuyahoga App. No. 95557, 2011–Ohio–2917, ¶ 23, quoting *State v. Petro* (1947), 148 Ohio St. 505, 76 N.E.2d 370, at the syllabus.

> {¶ 52} Crim.R. 33(A)(6) provides that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: [w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of

-37-

newly discovered evidence, the defendant must produce at the hearing on the motion * * * the affidavits of the witnesses by whom such evidence is expected to be given * * *. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses." "While the language of the rule contemplates an evidentiary hearing to consider newly discovered evidence, such a hearing is discretionary and not mandatory." *Bedford v. Edwards*, Cuyahoga App. No. 94532, 2011–Ohio–91, ¶ 10, citing *State v. Stewart*, Cuyahoga App. No. 83428, 2004–Ohio–4073.

{¶ 53} In moving for a new trial, Bolan submitted Benson's statement, which identified the shooter as "Ray Ray" and described him as 5'6? to 5'7?, skinny build, with bricks tatooed on his right arm. Also attached to his motion, was a letter dated September 1, 2010, from the prosecutor addressed to defense counsel.FN3 In that letter, the prosecutor states that Benson gave her statement to the police on June 20, 2010. The letter indicates that her statement was taken by a detective who was not assigned to the case, and thus she was not shown any photo arrays to determine Bolan's identity. On either August 24 or August 25, 2010, the prosecutor gave defense counsel's assistant Benson's most recent address so counsel could serve her with a subpoena to testify in the case. The prosecutor also called Benson on August 24 and August 25, 2010, and left Benson messages to come to court.

FN3. The jury returned its verdict on August 27, 2010.

{¶ 54} Later in the day on August 27, 2010, Benson called the prosecutor, stating that "she had been chased all over town by several relatives of the person who was on trial, and had dropped her phone, and was scared. She stated that at least one of the people chasing her had a gun." Benson refused to give her whereabouts, and did not come in, even after being advised there was an active bench warrant issued for her by the trial judge. Then on Sunday, August 29, 2010, Benson called the prosecutor stating that she would come in voluntarily on Monday to take care of the bench warrant and that "the person we went to trial against was not the shooter in the case, and in fact, the shooter was one of the people chasing her on Friday, with a gun."

{¶ 55} We recognize that "[b]efore a trial court may grant a motion for a new trial on the grounds that a witness has recanted his testimony, a trial court must determine whether the statements of the recanting witness are credible and true. Newly discovered evidence recanting testimony is 'looked upon with the utmost suspicion.' The court is to ascertain the credibility of the witness. Thus, a motion for a new trial that is based on recanted testimony is to be granted only when the court is reasonably satisfied that the trial testimony given by a material witness was false." (Internal citations omitted.) *State v. Braun*, Cuyahoga App. No. 95271, 2011–Ohio–1688, ¶ 39.

{¶ 56} In the instant case, Bolan failed to provide credible evidence to warrant a new trial. Both Ogletree and Wheeler identified Bolan as the shooter. Benson's statement only changed after she notified the State that she was scared because she had been chased all over town by several of Bolan's relatives, one of which had a gun. This new evidence lacks credibility because it demonstrates that Benson was coerced. Evidence of witness intimidation was further supported by Arthur Smiley's (Smiley) recantation. Smiley who witnessed the shooting, stated to the police that "Ray Ray" was the shooter and identified Bolan as the shooter from a photo array. Smiley then changed his statement after being in the same holding cell as Bolan. Smiley signed a letter stating that he did not see what happened and that he made up the accusations against Bolan. Accordingly, the trial court did not abuse its discretion when it denied Bolan's motion for a new trial without conducting a hearing.

{¶ 57} Thus, the fifth assignment of error is overruled.

*State v. Bolan*, 2011 WL 3925584 at * 10-11.

Although this Court does not necessarily agree with the state appellate court's characterization of Benson's statement as "recantation" testimony, it bears noting that the state appellate court considered many of the same factors that would be considered in a federal due process analysis; e.g., the credibility of Benson's statement to the prosecutors and the strength of the other evidence supporting the jury's verdict. Nonetheless, even if the Court were to conduct a *de novo* review of this claim, it would find the trial court's denial of Bolan's motion for new trial without a hearing did not rise to the level of a federal due process violation. As explained *supra*, in order to establish a due process violation, Bolan must demonstrate the trial court's denial of his motion for new trial was "so egregious" that it violated his right to a fundamentally fair trial. *Pudelski*, 576 F.3d at 610.

The state court record contains the following facts regarding this claim. Ms. Benson was initially identified as a State's witness and was under subpoena by the prosecution at the time of trial. (Doc. No. 8-7 at 31.) The State elected not to call her and rested on Friday, August 27,

-39-

2010. *Id*. at 4, 28. Bolan also subpoenaed Ms. Benson and intended to call her as a witness. *Id*. at 28-29. However, she failed to appear at the courthouse on August 27th, despite defense counsel's attempts to reach her. *Id*.

At trial, defense counsel explained that he believed Ms. Benson was a crucial witness for the defense. (Doc. No. 8-7 at 36-37.) He indicated Ms. Benson was the only person to actually witness the shooting and stated he expected her testimony to show that "[h]er description of who pulled the trigger has absolutely nothing to do with Mr. Bolan." *Id*. at 37. Defense counsel's belief that Ms. Benson would so testify was based on a statement given by her to the police on June 20, 2009. (Doc. No. 14-1 at 17-20.) This statement was provided to the defense prior to trial during the course of discovery. (Doc. No. 8-1 at 50.) In her statement, Ms. Benson claimed she witnessed the shooting of Jerome Fears and she identified the shooter as an individual named "Ray Ray." (Doc. No. 14-1 at 19.) She describes the shooter as follows: "Short, about 5'06", 5'07", medium brown. He had braids then, but not now. No facial hair. He's like 180 at the most, he's real little. He's skinny. He got a DTW tattoo on the inside of his right arm and he got bricks going down his forearm. He got a tattoo on the left side of his neck and it's a female name. I can't remember the name. One pierced ear on his left side. He always got a do-rag and a skull-cap on. 24-7. Black or red. He never wears a ball cap." *Id*.

Bolan maintains Ms. Benson's description of the shooter is contrary to his physical appearance, which he describes as "heavier, taller, and muscular." (Doc. No. 13 at 12.) Bolan also claims he does not have the tattoos described by Ms. Benson. (Doc. No. 8-7 at 37.)

Defense counsel requested the trial court issue a bench warrant for Ms. Benson. (Doc. No. 8-7 at 29.) The trial court agreed to do so, but expressed frustration with defense counsel.

*Id.*  Specifically, the trial court noted it had offered to issue a bench warrant for Ms. Benson the previous day, but defense counsel had declined.  *Id.* at 29, 34.  Although agreeing to issue the warrant, the trial court made it clear it would not delay the proceedings.  *Id.* at 29-30.  After the court denied Bolan's request for a recess in order to secure Benson's appearance, defense counsel moved for a mistrial.  *Id.* at 34- 43.  The trial court denied the motion.  *Id.* at 43.

After hearing off-the-record arguments at sidebar, the trial court relented and agreed to a one hour continuance to secure Ms. Benson's attendance.  *Id.* at 44-45.  At the expiration of the continuance, defense counsel had still not located Ms. Benson and the defense rested.  *Id.* at 46.  Counsel then unsuccessfully sought to have Ms. Benson's June 2009 statement (and a police report summarizing the same) introduced into evidence due to her unavailability.  *Id.* at 47-57, 70-71.  The trial court adjourned for a lunch break, after which it was confirmed that Ms. Benson still had not been located.  *Id.* at 64-71.  The court then charged the jury and closing arguments were made.  *Id.* at 72-150.  Later that day, the jury returned a verdict of guilty on all charges.  *Id.* at 170-178.

Approximately two weeks later, on September 9, 2009, Bolan filed a motion in the trial court arguing (among other things) that he was entitled to a new trial because "new evidence material to the defense exists that disclose a strong possibility of a change in the result of the verdict."  (Doc. No. 8-1 at 7-15.)  The "new evidence" consisted of a letter from prosecutor Kevin Filiatraut to defense counsel regarding post-trial communications his office had with Ms. Benson.  This letter is dated September 1, 2010 and provides, in pertinent part, as follows:

> This letter is to inform you of recent developments with regard to a witness in the matter of State of Ohio v. Raymond Bolan, pursuant to our continuing duty to inform criminal defendants of potentially exculpatory evidence.  As you are aware, on 6-20-10 [sic], Carlyelia Benson, made a written statement to the

Cleveland Police regarding the homicide of Jerome Fears on 6-20-09.  In the statement, she states that an individual named "Ray Ray" was the shooter, and gives a description of Ray Ray.  However, she made the statement to Detective Echols, who was not assigned to the case, and was not shown any photo arrays, lineups, or single photos to determine the identity of Ray Ray.  Her written statement and all police reports regarding her statement were provided to all attorneys for Raymond Bolan in discovery.

* * *

On Thursday, 8-26-10, you told Judge Synenberg that you had caused Ms. Benson to be served and that she had not appeared.  Judge Synenberg asked if you wanted a bench warrant for the witness, and you stated that you did not want one.  Rather, you wanted Ms. Benson to come to court voluntarily under the defense subpoena. Prior to leaving court that night, I gave your assistant Ms. Benson's last known phone number, and later that night, both APA Meyer and myself left voice messages on the same phone number for Ms. Benson to come to court on Friday 8-27-10.

On Friday, 8-27-10, Ms. Benson did not appear in court. The court granted the defense motion for a bench warrant for Ms. Benson.  Later that date, you stated that you spoke to police dispatch and had learned that the police had Ms. Benson, but they needed the warrant to be faxed to them in order to act on it and bring her in.  Later that date, you stated to the court that you actually did not speak to police dispatch, but you learned that Ms. Benson was supposed to have come in voluntarily but had hopped out of the car that she was in, and therefore was not in court yet.  **Later that same date, Ms. Benson called the Cuyahoga County Prosecutor's Office as well as myself directly on my personal cell phone.  She stated to Teresa Matthews, of the prosecutor's office, and to myself, that she had been chased all over town by several relatives of the person who was on trial, and had dropped her phone, and was scared.  She stated that at least one of the people chasing her had a gun.  She refused to give her whereabouts, and did not come in, even after being advised there was an active bench warrant issued for her by the judge in the trial.**

On Sunday, 8-29-10, I received a call from Ms. Benson on my personal cell phone.  I again advised her that there was an active bench warrant out for her, and asked her to speak to APA Meyer regarding an unrelated case where she was a witness and needed to come to court in Judge Fuerst's courtroom the next day– Monday, 8-30-10.

Later that same date, APA Meyer spoke to Ms. Benson.  At that time Ms. Benson said she would come in voluntarily on Monday, 8-30-10 to take care of the bench warrant.  **She further stated that the person we went to trial against was not**

-42-

**the shooter in the case, and in fact, the shooter was one of the people chasing her on Friday, with a gun.**

On Monday, 8-30-10, I orally advised you of what Ms. Benson told APA Meyer and myself on Sunday, 8-29-10.  This letter is so that this advisement is in writing as required by the criminal rules.

(Doc. No. 14-1 at 21-22.)  Bolan specifically requested the court conduct a hearing on the motion.

(Doc. No. 8-1, Exh. 3.)  The trial court summarily denied the motion from the bench on

September 14, 2010, just prior to sentencing.  (Doc. No. 8-7 at 180.)  Later that day, the court

issued a one-line Journal Entry denying Bolan's motion.  (Doc. No. 8-1, Exh. 4.)

The Court finds the trial court's denial of Bolan's motion for new trial without a hearing

was not "so egregious" that it violated his right to a fundamentally fair trial.  The new evidence

supporting Bolan's motion for new trial was Ms. Benson's post-trial communication to the

prosecution (on August 29, 2010) that "the person we went to trial against was not the shooter in

the case and, in fact, the shooter was one of the people chasing her on Friday with a gun."[12]  (Doc.

No. 14-1 at 22.)  As the state appellate court noted, there was reason to question Ms. Benson's

credibility at the time she made this communication to the prosecution.  On August 27, 2010, Ms.

Benson reported to the prosecutor that she had been chased "all over town by several relatives of

---

[12] Benson's statement to police that included an identification of the shooter that was allegedly inconsistent with Bolan's appearance, does not constitute "new" evidence.  It is undisputed that Bolan was provided with both Ms. Benson's June 2009 statement, and the police report summarizing her statement, prior to trial.  (Doc. No. 8-1 at 50.)  Thus, Bolan was already aware that Ms. Benson had witnessed the shooting and that her description of the shooter was inconsistent with Bolan's physical appearance.  Indeed, in seeking a continuance to secure her appearance at trial, defense counsel argued at length that Ms. Benson was a crucial witness for this very reason.  (Doc. No. 8-7 at 36- 37.)  While the trial court refused to allow Ms. Benson's statement to be introduced into evidence, Bolan does not raise a claim in these habeas proceedings that the state courts violated his federal constitutional rights by failing to admit this statement (or the summary thereof).

-43-

the person who was on trial" and was (quite understandably) frightened.  *Id.*  Given these circumstances, it would not have been unreasonable for the trial court to question the credibility of her subsequent communication two days later that "the shooter was one the people chasing her on Friday, with a gun."  *Id.*  Indeed, when Ms. Benson initially reported to prosecutors on August 27, 2010 that she had been chased by Bolan's relatives with a gun, she did not then indicate that one of the people chasing her was the actual shooter.  *Id.*  This detail did not emerge until Ms. Benson had a subsequent conversation with prosecutors on August 29, 2010.  *Id.*

Finally, the Court cannot say this is a situation where the State's case against Bolan was so weak that denying him a new trial on the basis of Ms. Benson's post-trial communications with prosecutors denied him a fundamentally fair trial.  As the state appellate court noted,  Ms. Ogletree and Mr. Wheeler provided testimony that identified Bolan as the shooter.  (Doc. No. 8-5 at 173, 175-176; Doc. No. 8-4 at 143-147, 157-158, 172-173, 193-195.)  Bolan maintains that (unlike Benson) these witnesses did not actually see who shot Mr. Fears.  He further asserts their identifications of him lacked credibility for various reasons.  However, Bolan had the opportunity to (and did) cross-examine both of these witnesses extensively at trial.  While Ms. Benson's statements to the prosecution might have supported the defense's theory, the Court finds, in light of Ogletree and Wheeler's testimony, that Bolan has failed to demonstrate that the denial of his motion for new trial without a hearing rises to the level of a due process violation.

Accordingly, and given the high bar Bolan must overcome to demonstrate an alleged federal due process violation, the Court finds Bolan's second ground for relief is without merit.  Further, the Court denies Bolan's request that "this court . . . hold a hearing to determine the weight and probative value of the proffered evidence." (Doc. No. 13 at 13.)  Generally, a habeas

petitioner is entitled to an evidentiary hearing in federal court if the petition "alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 459–460 (6th Cir. 2001) (citing *Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir. 1994) (citation and internal quotation omitted)).  However, a petition may be summarily dismissed if the record clearly indicates that the petitioner's claims are either barred from review or without merit.  *Id.*

Upon careful review, the Court determines the issues presented in Bolan's second ground for relief can be resolved from the record provided by Respondent.  Accordingly, Bolan's request for a hearing on this issue is denied.

## V.  Conclusion

For the foregoing reasons, it is recommended that Bolan's Petition be DENIED.


/s/ Greg White_____
U.S. MAGISTRATE JUDGE

Date: August 27, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**